FLORENCE E. KITTEL, Appellant, v. MAURICE C. STRAUS
et al., Respondents.

(181 N. W. 628.)

**Homestead — wife entitled to cancelation of mortgage where purpose for
which it was given fails.**

In an action to cancel a mortgage as a cloud on plaintiff's title to home-
stead property, where it appeared that the plaintiff joined with her husband in
the mortgage, which she understood to have been given as security for the
performance, by her husband and another, of certain contract obligations, and
where the obligees in that contract, discovering fraud on the part of plaintiff's
husband sufficient to justify rescission thereof, promptly rescinded and re-
pudiated it, but retained the mortgage under a prior agreement with the hus-
band that he would give such a mortgage as security for a pre-existing debt,
it is *held:*

1. Where a wife joins in a mortgage upon a homestead, with the understand-
ing that it is to be used for a specific purpose, and where the purpose fails and
the rights of innocent third parties have not attached or been prejudiced, the
wife has an equitable right to have the mortgage canceled as a lien upon the
homestead.

Opinion filed December 27, 1920.    Rehearing denied February 7, 1921.

Appeal from the District Court of Cass County, *A. T. Cole,* J.
Reversed and remanded.

*Engerud, Divet, Holt,* and *Frame,* for appellant.

*Lawrence & Murphy,* for respondents.

Statement of facts by BIRDZELL, J.    Two actions were by stipula-
tion consolidated and tried as one.    One is an action by Florence Kit-
tel, mortgagor, against Straus and others, to cancel a mortgage execut-
ed by her on December 2, 1915, running to the First National Bank of
Casselton, mortgagee, and to remove the same as a cloud upon her title
to the property therein described.    The other is an action by the First
National Bank of Casselton against Richard C. Kittel and Florence
Kittel, his wife, to foreclose the same mortgage.    Separate findings,
conclusions, and judgments were entered in the two cases, and separate
appeals were taken to this court.    The parties have stipulated that the

appeal in the foreclosure action shall abide the result of the appeal in the action to remove cloud. The important facts are substantially as follows:

For sometime prior to the execution of the mortgage in question Richard C. Kittel had been president of the First National Bank of Casselton and W. F. Kittel, his brother, had been cashier. It appears that during the summer of 1915 it became known to the National Bank Examiner and to the directors of the bank that the bank was carrying among its assets considerable bad paper. This matter had been discussed somewhat, and had become a matter of negotiation between Richard Kittel and the directors, and between the directors and the Comptroller of the Currency. Kittel, from time to time, assured the directors that he would make good all the bad paper, and the directors in turn made representations to the Comptroller of the Currency that they would see that the bank was rendered in unobjectionable condition by the end of the year. By the latter part of November, 1915, the directors had concerned themselves seriously as to the condition of the bank. Conversations were held between them and with Kittel at various times, looking toward the making of a definite arrangement whereby they would relieve the bank of the objectionable paper and Kittel indemnify them by his own obligation supported by collateral in the shape, principally, of stocks and bonds. These negotiations took on definite form at meetings held November 27th and 28th, and December 2d and 3d.

Among the bad paper that had been under discussion prior to November 27th was an unsecured promissory note of Richard C. Kittel for $5,000, dated October 1, 1913, and payable on demand. The directors, at Kittel's request, had made no reference to this note in their prior resolutions concerning the bad paper, but it seems nevertheless to have been condemned by them. During some of their earlier meetings, also, Kittel had turned over to Straus some forty shares of his stock in the First National Bank as collateral to the obligations the directors were assuming with reference to some of the bad loans for which Kittel recognized that he should be held responsible. Some of the directors testify, and we shall assume it to be a fact, that during these earlier negotiations it was understood that Kittel would secure his $5,000 note by giving a mortgage upon his residence prop-

erty for $6,000; that the difference between his note, with the accrued interest, and the new obligation of $6,000, should be credited to his account in the bank, upon which he would be permitted to draw cash in payment of traveling expenses in his future operations in the real estate business. R. C. Kittel resigned as director and president of the bank on November 28th, and Straus succeeded him as president. W. F. Kittel resigned as cashier on November 29th, and his resignation was immediately accepted by Straus.

It seems that no definite arrangement for the future conduct of the business of the bank resulted from the meeting of November 27th and 28th, other than the change in management, but on the afternoon of December 2d a meeting was held, attended by the Kittels and a number of the directors, and by one Tenner, who was acting as attorney for the directors. In the interim there had been an examination of the bank by two persons from Minneapolis, and from this examination it appeared that Kittel's shortage was in the neighborhood of $75,000. This meeting continued until about 3 o'clock in the morning of December 3d. Late at night on December 2d, W. F. Kittel went from this meeting to the residence of Richard C. Kittel for the purpose of securing the signature of Florence E. Kittel to the mortgage in question. The mortgage was executed, and upon his return it was placed among the papers that were the subject-matter of the negotiations. When the meeting finally adjourned, a contract had been entered into between Straus, Johnson, Gray, Dittmer, Ford, and Runck, who were members of the board of directors, as parties of the first part, and Richard and William Kittel as parties of the second part.

This agreement provided, in substance, that the parties of the first part would take over the bank; also some objectionable bonds previously held in its assets; and reimburse the bank for all paper which the National Bank Examiner ordered taken out, together with all existing liabilities, discrepancies, and differences in reconcilements; and that they would continue to operate the bank. The parties of the second part agreed to repurchase the objectionable bonds by January 1, 1916, with interest, and by January 15th to purchase certain objectionable notes to which reference had previously been made on the minutes, and on or before December 1, 1916, to pay all losses, liabilities, and discrepancies which the first parties might be called upon

to pay under the agreement. As security for the performance of their obligations, the Kittels agreed to turn over 283 shares of stock in the bank, 815 shares of stock in the Northern Trading Company, 18 shares in the Casselton Realty Company, 3 shares in the Frank Lynch Company, 8 shares in the Farmers State Bank of Towner, $60,000 of the bonds of the Northern Trading Company, *"and a mortgage execut-ed by the said R. C. Kittel and his wife, upon their residence prop-erty in Casselton* and the vacant lots across from the same for $6,000."* A few days later it was discovered that Kittel's shortage was a great deal larger than the parties had anticipated, amounting eventually to $240,000. A resolution of insolvency was passed on December 6th, and the bank examiner, C. H. Anhier, was placed in charge. At An-hier's request Kittel subsequently executed, as of December 2, 1915, a $6,000 note payable December 2, 1916. This was treated as a renew-al note of Kittel's $5,000 note. It was attached to that note and was later entered in the books of the bank as an asset. The mortgage was recorded on December 27th. On January 10, 1916, the directors who had signed the agreement of December 2d served upon the Kittels a notice of cancelation and rescission of the agreement, in which it was stated that the parties rescinding "offer and tender to you all matters and things received or tendered to them by you under this agreement." Kittel never drew the cash representing the difference between the mortgage and his old note, but nearly all of the balance was used with his consent to take up an overdraft of the Northern Trading Company. In other ways, as in directing changes to be made in the loss payable clauses of the insurance policies upon the property, for instance, Kittel recognized the rights of the bank under the mortgage.

BIRDZELL, J. (after stating the facts as above) : The sole question for our consideration upon this appeal is the validity of the mortgage referred to in the above statement as a lien upon the homestead of Rich-ard and Florence Kittel. There is no question but what the mortgage given is the one referred to in the contract of December 3d, and there is nothing to show that Florence Kittel knew of any other considera-tion for the mortgage than such as was stated in that contract. The only testimony in the record concerning the circumstances of the execution of the mortgage by her is that of W. F. Kittel, who took it

to her for execution and took her acknowledgment. He testified by deposition as follows:

"I took the mortgage to her and told her that a new contract was being entered into with the directors of the bank, by which they agreed to continue to operate the business of the bank, in which they agreed to remove any assets of the bank objectionable to the department. . . . I explained to her the terms of the contract and the fact that it was drawn to take care of any liability of my brother and myself to the bank, and that the mortgage was required by the directors to guarantee the fulfilment of the contract by my brother and myself."

Even if this testimony be considered of doubtful credence in view of the witness's fraud and deception as an officer of the bank, for which he was later convicted in the Federal court for violation of. § 5209, U. S. Comp. Stat., it can scarcely be disregarded entirely in view of the fact that it is so fully corroborated by the reference to the mortgage and the purpose for which the security was given as contained in the contract of December 3d. In this state of the record we cannot find that Florence Kittel executed this mortgage for any purpose other than that stated in the testimony of William F. Kittel and in the contract. The mortgage, in its effect upon the homestead, will therefore have to stand or fall in the light of its execution for this purpose as affected by the subsequent transactions regarding the contract.

It is true that Kittel further testified that Mrs. Kittel would only consent to a delivery of the mortgage upon condition that the directors would not prosecute her husband, and that he communicated this condition to the directors. If the performance of such a condition be regarded as the consideration for the mortgage, it is obvious that it would be illegal as compounding a felony, and the entire mortgage would be void. If, on the other hand, it should be regarded merely as a condition affecting delivery, the condition is not operative after delivery to the grantee (Comp. Laws 1913, § 5497); and the question of the consideration for the mortgage is still open to inquiry. Of course it is not the law—and neither party to this proceeding contends that it is—that the consideration for a mortgage cannot be inquired into after delivery to the grantee or mortgagee. The majority of the court does not hold the consideration to be illegal, nor does it give effect to any condition upon which the mortgage was delivered.

The bank held this mortgage but a few days before it was ascertained that it would be impossible to carry out the contract. In the meantime neither the bank nor the directors had assumed any new obligation in reliance upon the mortgage, nor had either in any way altered their position. At most, according to the bank's contentions, it had taken the mortgage as security for a debt long past due, and it was not until after the bank had closed that the excess was applied to wipe out the overdraft of the third party, with Kittel's consent. The contract under which Florence Kittel understood that the mortgage was being given was soon rescinded, so far as the directors of the bank were able to rescind it, except for their failure to return the mortgage in question, and, possibly, some of the shares of stock which had been originally pledged with Straus. They refused to recognize it further as having any binding effect. Could they thus rescind the contract, and, as against Florence Kittel, leave the mortgage in possession of the bank as security for Kittel's pre-existing debt?

We have no good reason to doubt that, prior to the execution of the contract of December 3d, there was an understanding between Richard Kittel and some of the directors of the bank that he would mortgage his residence property to secure his past-due note. This is the testimony of Straus and some of the other directors. But there is no evidence that Florence Kittel was ever made aware of this promise, and neither is there any evidence from which we would be justified in saying that she executed the mortgage, intrusting it to her husband to use as general security in any way he should see fit. On the contrary, the evidence discloses that she understood the nature of the arrangement that was being made on December 2d and 3d. But she was not a party to that contract, and was in no way responsible for the fraud of her husband which occasioned its rescission and cancelation. She had the undoubted right to determine the conditions and terms upon which she would convey the homestead. The statute requiring a conveyance of a homestead to be executed and acknowledged by both husband and wife does not spend its force in exacting a mere formal act. It implies that either shall have power to give or withhold consent entirely, or to attach any condition that might be effective if the separate property of a grantor alone were involved. We are of the opinion that the record in the instant case clearly shows that the mortgage was

executed by Florence E. Kittel to be used as security for the performance of the specific contract of December 3d, and that when this contract was abandoned she had the same right to secure the release of the mortgage that she would have had if she had pledged her own property for a similar purpose. See Gammon v. Wright, 31 Ill. App. 353, 358; Johnson v. Callaway, — Tex. Civ. App. —, 87 S. W. 178, s. c. (Dashiell v. Johnson, 99 Tex. 546, 91 S. W. 1085); 13 R. C. L. 630.

While it might at first blush seem but equitable to allow the bank to foreclose the mortgage upon the homestead, as it was voluntarily executed and secures but a small part of the indebtedness of the officer whose conduct was responsible for so large a loss, it is evident to a majority of the court that it cannot be permitted in the instant case without trenching upon the policy of the law with respect to the homestead estate. To permit a mortgage to be enforced as against the homestead estate where it has been obtained for one purpose and is being applied to another, and where the rights of no innocent third party have attached but remain *in statu quo,* would be to establish a precedent that would deprive the homestead estate of the protection which the Constitution and the statutes have sought to accord to it.

It follows from what has been said that the mortgage is of no effect as a lien upon the homestead of Richard and Florence Kittel. In so far, however, as it creates a lien upon any property of Richard Kittel exclusive of the homestead estate, it is valid, as he had agreed to secure the specific obligation and recognized the mortgage as such security subsequent to the contract of December 3d. This lien was not defeated by the subsequent conveyance of the residence property from Richard Kittel to his wife. The judgment appealed from is reversed and the cause remanded, with directions to enter judgment in accordance with the foregoing opinion. The appellant will recover costs.

CHRISTIANSON, Ch. J., and BIRDZELL and GRACE, JJ., concur.

BRONSON, J. I dissent. The majority opinion holds invalid the mortgage involved, only so far as the same affects the homestead rights of the plaintiff. The majority opinion sustains the mortgage as a lien upon the property not within the homestead estate. It therefore upholds the testimony and contentions of the defendants and the findings and conclusions of the trial court to the effect that this mortgage was

given by the husband of the plaintiff to secure an indebtedness of $5,000, and interest, owing by the husband to the bank, and for advances to be made, covering traveling expenses or other incidental matters, and that such mortgage was not given as collateral in connection with the making of exhibit 100, which was afterwards repudiated between the directors of the bank and the husband. At the time this mortgage was executed, the property so mortgaged stood in the name of the husband. The majority opinion, further, is practically based entirely upon the testimony of one W. F. Kittel concerning the circumstances of the execution of the mortgage by the plaintiff, and upon the asserted fact that there was nothing to show that the plaintiff knew of any other consideration for the mortgage than such as was stated and in that contract. It is to be noted that the plaintiff in this case did not testify and no reason is asserted in the record for the absence of her testimony. The trial court prepared extensive findings and also an extensive memorandum opinion showing that he had given this case very careful and considerate attention. The trial court has found that this mortgage was executed by the plaintiff as the result of representations made to her by her husband and his brother, W. F. Kittel, in connection with their business with the defendant bank; that she did not seek any interview with any of the members of that bank, or any explanation with reference to the execution of this mortgage, or make any statement with reference to any restrictions as to its use and purposes; that she knew that her husband had been the head of that bank for a long time and had managed its affairs, and therefore must have known the relations and financial matters to be calculated and considered in making a settlement between the bank and her husband; that the execution of this mortgage was for the accommodation and use of her husband at his solicitation and the solicitation of this W. F. Kittel; that, both in reason and law, she constituted her husband her agent to use this mortgage for the purposes he deemed best in dealing with the bank. The trial court further found that the value of the homestead consisting of four lots, being a part of the premises mortgaged, was $8,000, or $3,000 in excess of the homestead limitation of $5,000. It is to be noted that the record discloses that this bank was wrecked and went into the hands of a receiver by reason of acts of default of the plaintiff's husband and his brother; that this husband

pleaded guilty to making false entries and misapplication of funds under the Federal Statutes, and was sentenced to the Federal Penitentiary and at the time of this trial was on parole; that the testimony of this brother W. F. Kittel was taken in the Federal Penitentiary, at Leavenworth, where he was then confined under sentence for violating the banking laws, and that there is testimony in the record to the effect that he was discharged from the bank when discovered in acts of forgery.

The majority opinion, however, have not stated the real reason why the plaintiff signed this mortgage. It has *not* stated the testimony of this Kittel, which recites the *reason* why she signed this mortgage. Only that part of the testimony has been quoted by the majority opinion which contains Kittel's statement to the plaintiff, and not her statement to him. This testimony demonstrates, conclusively, the serious error in which the majority opinion has fallen in stating that the testimony, as quoted in the majority opinion, was the basis of her reason for signing the mortgage.

This testimony is as follows:

Q. You then returned the mortgage, as I understand it, back to your brother at the bank?

A. She objected at first to signing it.

Q. Did she finally sign it?

A. She said she would not sign it unless there was a clause embodied in it to the effect that there would be no prosecution of my brother and myself.

Q. That clause was in the contract?

A. No, but I told her that such a clause, in my opinion, could not be inserted in the mortgage. She would only agree to sign the mortgage and deliver it to me with the understanding that it was not to be delivered to the directors of the bank unless they agreed that there should. be no prosecution of my brother and myself. She was very insistent upon this point, and at the time that I took the mortgage into the meeting of the directors and Mr. Tenner, I stated that the mortgage was delivered with this understanding, and that it should be returned to her if there was any prosecution of myself or my brother.

In this connection it is to be noted that, in the course of the proceedings of the bank's directors and in trying to make an adjustment of the

bank's affairs so that it might continue, it was represented and made to appear that the defalcations were something like $75,000. Later, however, this amount was discovered to be over $200,000, by reason whereof this bank went into the hands of a receiver. This testimony of the brother, therefore, concerning this demand of the plaintiff, upon which ground alone she consented to the signing and delivery of the mortgage is important because it demonstrates her knowledge of her husband's and her brother-in-law's doings in connection with the bank. It demonstrates further a familiarity of knowledge of the transactions of such parties. It is to be noted, further, that Kittel in his testimony testified that he took this mortgage and delivered it at the meeting of the directors, with this understanding that it should be returned to the plaintiff if there was any prosecution of himself or plaintiff's husband.

I am unable to find any testimony that this plaintiff signed this mortgage, and so agreed to sign for the reason that it was made as collateral to this contract between her husband, and the directors of the bank. Accordingly, the record, upon the testimony of this brother, discloses that the only understanding which the plaintiff had was for a conditional delivery of the mortgage based upon nonprosecution for crimes involved. It is rather difficult, therefore, to understand the holding of the majority opinion that this mortgage was executed by the plaintiff for the purpose of being collateral to this contract. Exhibit 100. The majority opinion does state that they cannot find that the plaintiff executed this mortgage for any other purpose than that stated in the testimony of this brother. That purpose, as stated in the majority opinion, is not the purpose as disclosed by the evidence of this brother and contained in his deposition. The majority opinion further states that if this testimony of the brother is of doubtful credence in view of his conviction, it is fully corroborated by reference to the mortgage and the purpose for which the security was given. It is difficult to understand what corroboration may thus be inferred when the mortgage itself speaks of a definite indebtedness and a definite note, and when the majority opinion otherwise finds the mortgage to be valid as security for this very indebtedness thus described in the mortgage. The majority opinion accordingly demonstrates the correctness of the trial court's findings, viewed in connection with the evidence above

47 N. D.—7.

stated herein. It is further evident that the testimony of this brother served as a self-serving declaration in favor of the plaintiff, who was not a witness, and who did not present herself to give testimony in this case. The majority opinion further practically states that it is only equitable to permit the foreclosure of this mortgage upon a homestead, but it cannot permit such to be done without intrenching upon the policy of the law concerning homestead estates. This is an action in equity; principles of equity should apply to the plaintiff as well as to her husband and this brother. Their actions should be scrutinized closely just as they were very closely scrutinized in a very recent case in Wisconsin, where the plaintiff was seeking to retain title conveyed by her husband and was there claiming to be a bona fide purchaser. See Spangler v. Kittel, 172 Wis. 583, 179 N. W. 759. It is not asserted in this record that any fraud, duress, or improper influence was exerted upon the plaintiff. This mortgage was delivered, as found by the trial court, and, as found by this majority opinion, to secure the indebtedness described in that mortgage. The mortgage as an instrument became valid only upon delivery. Stockton v. Turner, 30 N. D. 641, 153 N. W. 275.

It is well settled by statute and decisions that a mortgage cannot be delivered to the mortgagee conditionally. Comp. Laws 1913, § 5497; Sargent v. Cooley, 12 N. D. 1, 94 N. W. 576; First Nat. Bank v. Prior, 10 N. D. 146, 86 N. W. 362. This mortgage, upon its delivery, accordingly, took effect absolutely, discharged from the parol conditions upon which delivery was made. Upon this record, and pursuant to the findings of the trial court, also as sustained in the majority opinion, at least with respect to the property other than the homestead estate, it is further manifestly inequitable to permit this plaintiff, who, possessed of and chargeable with knowledge of her husband's and brother-in-law's transactions, asserted only one reason as a condition in the signing of this mortgage, to rescind her signature to the mortgage and to defeat the just claim of the bank. Upon principles of both equity and law the plaintiff is not entitled to prevail. The judgment in all things should be affirmed.

Bronson and Robinson, JJ., concur.

Robinson, J. (dissenting). On December 2, 1915, R. C. Kittel and

Florence, his wife, made to the First National Bank of Casselton a mortgage on seven lots in Casselton to secure $6,000, with interest at 8 per cent, according to one promissory note. Also, to secure any and all advances made to or on behalf of the mortgagors by the mortgagee; also, to secure any other present and future indebtedness of said mortgagors to the mortgagee. A few hours after the making of the mortgage R. C. Kittle and his brother made, with five directors of the bank, a written contract—exhibit 100. The contract recites that performance of its conditions by the Kittel brothers is secured by a lot of stocks and bonds and a mortgage made by R. C. Kittel and his wife for $6,000. On January 7, 1916, the directors who signed the contract individually, signed and served a notice of rescission and cancelation on the Kittel brothers. The notice, if true, shows that the contract was obtained by gross fraud. In November, 1916, Richard Kittel having first conveyed the seven lots to his wife, she commenced this action to cancel the mortgage because of the rescission. The bank commenced an action to foreclose the mortgage. The two actions were properly consolidated for trial as one action, and in each a judgment was entered in favor of the bank.

The findings of fact and conclusions of law cover twenty-five pages; the testimony, five hundred pages. The memorandum of the trial judge giving the reasons for his decision appears quite conclusive, and in it he cites forty decisions. Any attempt to recite or state the evidence would be of no avail. It is known to the parties and their attorneys, and strangers care nothing for it.

The basis of the complaint by Florence Kittel is that the mortgage was made only as security for the performance of the contract which the directors repudiated, and that after the delivery of the mortgage it was altered by inserting words and figures to make it appear as security for the promissory note of $6,000. Now the mortgage is in due and proper form. It shows no interlineations, erasures, alterations, or marks of suspicion. It makes no reference to the contract in question. It is made to secure $6,000 and interest according to one promissory note. The signatures of Richard Kittel and Florence Kittel are in a clear businesslike handwriting. The acknowledgment is by W. F. Kittel, a notary public. The plaintiff signed the mortgage for the use and benefit of her husband, and on such representations as he made to her.

She did not sign at the request of the defendants or on any representation made by them. Indeed, she never exchanged a word with any of them in regard to the mortgage. It was made to secure $6,000 promissory note given in renewal of a $5,000 note, and interest at 8 per cent. The note was long past due, and it was made by Richard Kittel to the bank, and Kittel had repeatedly promised to secure the same. When the mortgage was made, Kittel had just been forced to resign as president and director of the bank. He had confessed to defalcations of $75,000, but the correct amount was $240,000. Now, it seems by this action that Mr. Kittel and his wife are well disposed to defeat the mortgage security and thereby add to the defalcations $6,000, and interest. As a result of the Kittel defalcations the bank went into the hands of a receiver, and, to redeem it, the directors had to pay $240,000. Such being the facts, it seems a little nervy to ask a court of justice to set aside the mortgage. The judgment is so clearly just and right it needs no support from any elaboration or argument.